IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

STEVEN MILETTA and
KELLY MILETTA,

      Plaintiffs,

      v.

UNITED STATES OF AMERICA,
RANCO CONSTRUCTION, INC.,
JOSEPH TRONGONE, JR., INC.,
and SYSKA HENNESSY, INC.,

      Defendants,

---

SYSKA HENNESSY, INC.

      Crossclaim Plaintiff,

      v.

RANCO CONSTRUCTION, INC.,

      Crossclaim Defendant,

---

RANCO CONSTRUCTION, INC.

      Third-Party Plaintiff,

      v.

SYSKA HENNESSY, INC., and ST.
PAUL MERCURY INSURANCE CO.,

      Third-Party Defendants,

---

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 02-1349 (JBS)

**OPINION**

RANCO CONSTRUCTION, INC.,

      Defendant, Crossclaim
      Plaintiff,

   v.

JOSEPH TRONGONE, JR., INC.,

      Crossclaim Defendant.

APPEARANCES:

John R. Mininno, Esquire
MININNO LAW OFFICE
888B Haddon Avenue
Collingswood, New Jersey 08108
    Counsel for Plaintiffs

William A. Feldman, Esquire
FELDMAN & FIORELLO, LLC
Wayne Interchange Plaza I
145 Route 46 West
Wayne, New Jersey 07470-6830
    Counsel for Defendant Syska Hennessy, Inc. and
    Third-Party Defendant St. Paul Mercury Insurance Co.

John R. Gercke, Esquire
GERCKE, DUMSER, SHOEMAKER & SIERZEGA, PC
1236 Brace Road, Suite E
Cherry Hill, New Jersey 08034
    Counsel for Defendant Ranco Construction, Inc.

James H. Landgraf, Esquire
CURETON CAPLAN
950B Chester Avenue
Delran, New Jersey 08075
    Counsel for Third-Party Plaintiff Ranco Construction, Inc.

Bruce A. Tritsch, Esquire
One Passaic Avenue
Fairfield, New Jersey 07004
    Counsel for Defendant Joseph Trongone, Jr., Inc.

**SIMANDLE**, District Judge:

This matter arose when Plaintiff Steven Miletta fell roughly fifteen feet through a skylight on the roof of a building he had been subcontracted to repair.  Following a nine day trial, a jury awarded compensatory damages in favor of Steven Miletta in the amount of $100,000, and awarded his wife, Plaintiff Kelly Miletta, $0.  The following post-trial motions have been filed:

(1)  plaintiffs' motion for a new trial [Docket Item 122];

(2)  motion by Defendant Ranco for "Reconsideration of the Court's Opinion Issued on 10-6-03 . . . or, In the Alternative, Judgment on the Issue of Indemnification From Joseph Trongone, Inc. Pursuant to the Subcontract Between Ranco Construction Co., Inc. and Joseph Trongone, Inc." [Docket Item 120];

(3)  motion for summary judgment by Defendant Trongone seeking dismissal of Ranco Construction's amended cross-claims[1] [Docket Item 118];

(4)  cross-motion by Defendant Syska Hennessy seeking an order compelling Defendant Ranco to pay 70% of Syska Hennessy's total reasonable defense costs and attorney's fees [Docket Item 124]; and

(5)  "Application for Entry of Judgment On Defendant Ranco Construction, Inc.'s Affirmative Claim" (by James Landgraf, Esquire) [Docket Item 119.]

---

[1] Magistrate Judge Joel B. Rosen, by Order dated August 15, 2003, granted the motion by Ranco Construction for leave to amend its cross-claim and required that Ranco Construction serve and file the amended pleadings no later than September 5, 2003. [Docket Item 57.]  Ranco never filed an amended cross-claim, though Trongone has waived any objection to this procedural defect.

I.    **BACKGROUND**

In June 1997, the United States and Syska & Hennessy CEM ("Syska Hennessy") entered into contract number DACA 87-97-D-0039 for renovations to Building 5651, an existing housing facility at the Fort Dix, New Jersey, military base.  Syska Hennessy subcontracted the project's roofing work to Ranco Construction ("Ranco"); Ranco subcontracted certain aspects of the roofing work to Joseph Trongone, Jr., Inc. ("Trongone"); and Trongone subcontracted the structural steel work to Miletta Brothers, Inc., a company for which Plaintiff Steven Miletta was acting as principal owner, officer, and project superintendent on April 5, 2001 – the date Steven Miletta fell through a skylight on the roof of Building #5651.

Plaintiff subsequently brought suit against the United States and the above private contractors seeking compensatory damages for past and future pain and suffering and loss of enjoyment.[2]  Plaintiff Kelly Miletta brought suit seeking compensatory damages for loss of services from her husband both following the accident and during recovery.[3]

---

[2] The Court instructed the Jury at the close of all evidence that "Plaintiff Steven Miletta does not seek, nor should your Verdict include, damages for past or future medical care or for past or future wage loss." [Docket Item 111.]

[3] Plaintiffs originally brought this action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  By Opinion and Order dated July 21, 2004, the Court granted the motion for summary judgment by the United States, and dismissed all claims against it. [Docket Items 77, 78.]  The Court retained supplemental jurisdiction over Plaintiffs' remaining state law claims under 28 U.S.C. § 1367(a).

Following a nine day trial, the Jury returned its verdict on March 24, 2005, in favor of Steven Miletta, finding Mr. Miletta 50% comparatively negligent, Defendant Syska Hennessy 30% negligent, Defendant Ranco 15% negligent, and Defendant Trongone 5% negligent.  The Jury awarded compensatory damages in favor of Steven Miletta in the amount of $100,000, and awarded Plaintiff Kelly Miletta $0.  The Court thereafter molded this verdict in accordance with the pretrial agreement of all parties to include in the judgment the worker's compensation lien of $175,685.21. The Court added prejudgment interest of $43,633.79 for a total gross award of $319,319.03.  (Order for Final Judgment filed April 8, 2005.)  Applying the jury's verdicts of Plaintiff's and Defendants' respective negligence to the gross award, the Court entered final judgment in favor of Plaintiff Steven Miletta in the amount of $95,795.71 against Syska Hennessy, $47,897.85 against Ranco Construction, and $15,965.95 against Joseph Trangone, Inc.  (Id.)

## II.  DISCUSSION

### A.  Plaintiffs' Motion for a New Trial

Plaintiffs have timely moved for a new trial on all issues, arguing that the jury verdict was a compromise between damages and liability.  If Plaintiffs are correct, the Court must order a new trial.  Pryer v. C.O. 3 Slavic, 251 F.3d 448, 456-57 (3d Cir. 2001) (holding where damages award is the result of a compromise

5

a new trial should be ordered as to all issues).  If, on the other hand, the Court merely finds that the damages awarded to either Plaintiff is insufficient as a matter of law, it may, in its discretion, grant a partial new trial as to the issue of damages.[4]

Because the Court does not agree that the Jury returned a compromise verdict or that the damages awarded were unreasonably low, however, the Court will not disturb the verdict reached by the Jury.[5]

---

[4] The Court does not have the option of ordering an _additur_. Under New Jersey law, "the term _additur_ is used to describe an order denying the plaintiff's application for a new trial on condition that the defendant consent to a specified increase in the jury's award." _Fisch v. Manager_, 130 A.2d 815, 818 (N.J. 1957).  It is well-settled under New Jersey law "that the practice[] of . . . _additur_ violate[s] none of our constitutional interdictions and, if fairly invoked, serve[s] the laudable purpose of avoiding a further trial where substantial justice may be attained on the basis of the original trial." _Id._ at 823.  In the federal courts, however, _additur_ is prohibited by the force of the provision in the Seventh Amendment guaranteeing the right to trial by jury and that "no fact tried by a jury shall be otherwise re-examined by any court of the United States, than according to the rules of the common law." _Fisch_, 130 A.2d at 818-19 (citing _Dimick v. Schiedt_, 293 U.S. 474 (1936) (approving the use of _remittitur_ but prohibiting the practice of _additur_)). In fact, a federal court may never increase a judgment for a stated amount above that awarded by a jury, either directly or indirectly.  11 Wright, Miller & Kane § 2816.

[5] Plaintiffs additionally reiterate their objection at trial to the testimony of the defense expert, Michael Wright, as "an inadmissible net opinion."  (Pls. Br. at 6.)  By Oral Opinion delivered on March 22, 2005, the Court denied Plaintiffs' _Daubert_ motion, and limited Wright's testimony further at various points in his testimony.  Plaintiffs have offered no new arguments at this time and the Court will not revise its earlier rulings.

1.    <u>Rule 59(a) of the Federal Rules of Civil Procedure</u>

Rule 59(a), Fed. R. Civ. P., provides:

> A new trial may be granted to all or any of
> the parties and on all or part of the issues
> . . . in an action in which there has been a
> trial by jury, for any of the reasons for
> which new trials have heretofore been granted
> in actions at law in the courts of the United
> States. . . .

"Rule 59 gives the trial judge ample power to prevent what he considers to be a miscarriage of justice.  It is the judge's right, and indeed, his duty, to order a new trial if he deems it in the interest of justice to do so."  11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane § 2803 (2d ed. 1995).  In other words, a district court may, in its "exercise of discretion" "grant a new trial if required to prevent injustice or to correct a verdict that was against the weight of the evidence."  <u>The American Bearing Co. v. Litton Indus., Inc.</u>, 729 F.2d 943, 947 (3d Cir. 1984).

2.    <u>New Jersey Court Rule 4:49-1(a)</u>

The standard of review under New Jersey law is substantially similar to the federal one.  Under N.J. Court Rule 4:49-1(a):

> A new trial may be granted to all or any of
> the parties and as to all or part of the
> issues on motion made to the trial judge. . .
> .  The trial judge shall grant the motion if,
> having given due regard to the opportunity of
> the jury to pass upon the credibility of the
> witnesses, it clearly and convincingly
> appears that there was a miscarriage of
> justice under the law.

7

Where the motion is for a new trial on damages, the motion "should not be granted unless the damage verdict is so disproportionate to the injury and resulting disability as to shock the court's conscience and convince it that to sustain the award would be manifestly unjust, that is, unless it clearly and convincingly appears that there was a miscarriage of justice under the law." Tronolone v. Palmer, 539 A.2d 1224, 1226 (N.J. Super. Ct. App. Div. 1988) (internal citations omitted) (citing N.J. Court Rule 4:49-1(a)); see Mahoney v. Podolnick, 773 A.2d 1102, 1117 (N.J. 2001) (emphasizing that a jury verdict should remain undisturbed "unless it constitutes a manifest injustice that shocks the judicial conscience"). In making its determination, the court should view the evidence in the light most favorable to the non-moving party. Mahoney, 773 A.2d at 1117.

### 3.   Application of State or Federal Standard

"Motions for a new trial . . ., long considered to be within the exclusive purview of federal jurisprudence, were pulled into the vortex of substantive/procedural dichotomy by the Supreme Court's decision in Gasperini v. Center for Humanities, Inc." Hayes v. Cha, 338 F. Supp. 2d 470, 491 (D.N.J. 2004) (Rosen, Mag. J.). In Gasperini, 518 U.S. 415, 422 (1996), the United States Supreme Court decided "an important question regarding the standard a federal court uses to measure the alleged

8

excessiveness of a jury's verdict in an action for damages based on state law."  The implications of that decision are significant here as far as determining whether the state or federal standard of review should govern Plaintiffs' motion.  See Hayes v. Cha, 338 F. Supp. 2d 470, for a thorough analysis of the Gasperini decision.

In Gasperini, the Court examined the standard for a new trial under New York law, as codified by the New York State Legislature in 1986, which required "closer court review" than the common law "shock the conscience test" which had up to that time been employed by both state and federal courts in New York. Justice Ginsburg, writing for a majority of the Court, noted that the New York statute was substantive insofar as it provided standards for reviewing jury awards, as well as procedural in that it assigned the ultimate decision-making authority to appellate courts.  The Court concluded that "New York's law controlling compensation awards for excessiveness or inadequacy can be given effect, without detriment to the Seventh Amendment, if the review standard set out in CPLR § 5501(c) is applied by the federal trial court judge, with appellate control of the trial court's ruling limited to review for 'abuse of discretion.'" Id. at 419.

Here, unlike Gasperini, the state and federal standards of review for motions for a new trial are strikingly similar.  See infra; Hayes, 338 F.Supp.2d at 487.  "As the federal and New

9

Jersey rules have similar intent, and the standards developed under these rules are virtually identical, this court shall apply the federal standard when reviewing the jury award, and not displace it with the state standard," <u>Hayes</u>, 338 F.Supp.2d at 487, looking to applications of the state standard only for guidance.

        (a)  <u>The Jury Did Not Reach A Compromise Verdict</u>

Plaintiffs seek a new trial on all issues, asserting that the jury verdict was inadequate as a matter of law as it was the result of a compromise on the questions of liability and damages. The Court is not persuaded that such is the case.  In fact, the Jury's logical apportionment of liability among the three defendants demonstrates that its verdict was intelligent and reasonable.  As the entire verdict has not been tainted so as to require a new trial as to all issues, the Court will limit its analysis to the issue of damages.

        (b)  <u>Steven Miletta's $100,000 Recovery</u>

The evidence at trial supports that Mr. Miletta suffered serious injuries resulting from his fall.  For the twenty-six days following the accident, Mr. Miletta was confined to intensive care.  At trial, Stuart Dubowitch, an expert in orthopedic medicine, testified that he twice saw Mr. Miletta as a patient and that he reviewed Mr. Miletta's extensive medical records.  Dr. Dubowitch testified that Mr. Miletta suffered

severe head lacerations, multiple broken ribs, a collapsed lung, a head injury, and a shoulder injury.  Additionally, Dubowitch testified that Mr. Miletta was hypoxic, meaning that he was not getting enough oxygen.  Dubowitch described to the Jury in detail how difficult it was for Mr. Miletta to breathe following the accident, causing Plaintiff to remain in critical condition for his first week in intensive care.  Because of Mr. Miletta's difficulty with breathing, a tracheotomy tube was inserted into Plaintiff's neck where it remained for roughly 21 days.  Also, Plaintiff needed catheterization to aid him in excreting waste.

Moreover, Joseph Miletta, Jr. testified that he saw Plaintiff Miletta immediately after the accident and that he appeared unconscious.  Joseph Miletta testified that he visited Steven Miletta in the hospital every day and that for roughly the first three weeks Plaintiff was "completely out."  Joseph Miletta testified to the medical equipment being utilized to support Plaintiff and that medical staff had inserted a long needle into Plaintiff's lungs to drain excess fluid.  Mr. Miletta also testified in detail to the pain and suffering he endured following the accident and during his recovery.

Additionally, however, there was evidence that Mr. Miletta's recovery was successful once he was discharged from the hospital. For example, there was testimony that shortly after returning home from the hospital Mr. Miletta traveled a considerable

11

distance from Cedarville to the site of his accident at Ft. Dix-
McGuire Air Force Base.  Moreover, the Jury saw how easily Mr.
Miletta could get up from a kneeling position without having to
exert significant pressure on his hand.[6]  Finally, the Jury heard
testimony that Mr. Miletta was working full-time in his steel
fabrication business (albeit with certain physical limitations)
within eight months after the accident, and that he has not
received medical care related to this accident in several years.

Based on the above, it was reasonable for the Jury to have
concluded that Mr. Miletta was entitled to no more than $100,000.
In Lombardo v. Hoag, 634 A.2d 550 (N.J. Super. Ct. App. Div.
1993), cert. denied, 640 A.2d 850 (N.J. 1994), the plaintiff was
riding in the bed of a pickup truck that was involved in an
accident.  Plaintiff suffered severe injuries, including a
fracture subluxation of the spine resulting in compression of his
spinal cord, severe neck pain, leg spasms, vomiting, loss of
sensation on his left side and inability to move his extremities.
After undergoing surgery, the plaintiff continued to need
catheterization and suppositories to aid him in excreting waste.
Also, the plaintiff continued to suffer from spasticity.

The plaintiff made continued progress through treatment and
therapy, however, and even though at the time of trial he

_____

[6] This demonstration was ostensibly an attempt by Miletta to
disprove that immediately prior to the accident he pushed on the
skylight cover to help him get up from the roof.

12

suffered from a limp and was still complaining of pain and limited movement in his neck and arm, he had not received medical treatment beyond checkups in the 5 years preceding trial.  The court in Lombardo upheld a $200,000 jury verdict, concluding that the jury could have reasonably relied on the "remarkable recovery" made by the plaintiff to justify its damages award.

This Court has determined that the Jury here could have similarly relied on a successful recovery theory in awarding Mr. Miletta no more than $100,000 for his past and future pain, suffering and loss of enjoyment.  Following the close of evidence, the Court properly instructed the Jury: "If you find for Mr. Miletta, he is entitled to recover fair and reasonable money damages for the full extent of the harm caused, no more and no less." [Docket Item 111.]  The Court is convinced that the Jury followed that instruction.  Far from shocking this Court's conscience, the Court believes that the result reached by the Jury was fair.

> Merely because the verdict may have been less
> than anticipated or hoped for by the
> plaintiff is no more reason to set aside the
> verdict and grant a new trial than a verdict
> that may be substantially higher than
> expected by a defendant.  Under our system of
> jury trials, litigants inevitably run the
> risk that the jury's determination of the
> amount of damages may vary substantially from
> reasonable expectations of litigants.

<u>Governali v. American Tempering, Inc.</u>, 1988 U.S. Dist. LEXIS 265, at *14 (E.D.Pa. Jan. 20, 1988).  This Court will not upset the jury's verdict.

(c)  <u>Mrs. Miletta's $0 Recovery</u>

Plaintiffs also seek a new trial on Mrs. Miletta's claim for loss of services and companionship.  The question presented by this motion is much closer than that for her husband.  However, for the reasons now explained, the Court will likewise not disturb the jury's verdict as to Mrs. Miletta.

Generally, "[o]ne who by reason of his tortious conduct is liable to one spouse for . . . bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse . . . ."  Restatement (Second) Torts § 693 (1977).  A narrower issue is before the Court here – namely, whether recovery by one spouse for tortious conduct of a third party requires an award of damages to the other spouse for loss of services and companionship.  Other courts have had the occasion to answer this question and this Court will look to those decisions for guidance.

In <u>Governali</u>, <u>supra</u>, 1998 U.S. Dist. LEXIS 265, a husband and wife brought an action against a company, claiming that the negligence of one of the company's employees was a proximate cause of an accident involving Mr. Governali.  Specifically, Mr. Governali was injured when he was struck by a 600 to 900 pound

14

roll of plastic which fell from a forklift being operated by one of the defendant's employees.  Following the liability phase of a bifurcated trial, the jury found that the defendant was 70% negligent and Mr. Governali was 30% negligent.  After the damage phase of trial, the jury awarded Mr. Governali $150,000 for past and future medical expenses, past and future pain and suffering, and past and future loss of earning capacity.  The jury returned a verdict of zero for his wife on her claim for loss of consortium.[7]  The plaintiffs filed a motion for a new trial as to both liability and damages arguing that the damage award for Mr. Governali was inadequate and that the $0 verdict for Mrs. Governali represented an "inconsistent verdict."

In denying Mrs. Governali's motion for a new trial, the district court in Governali explained that "[w]hile Mrs. Governali did testify with regard to her loss of consortium, the jury was free to accept or reject her testimony even though it was uncontradicted and unrefuted."  1998 U.S. Dist. LEXIS 265, at *15.  Moreover, the court held that "the verdict of zero is not logically inconsistent with the jury's award of $150,000.00 to Mr. Governali.  It can logically be concluded that the jury found that Mrs. Governali's loss of consortium was not caused by the injuries sustained by Mr. Governali in the accident."  Id.

---

[7] Under Pennsylvania law, loss of consortium includes loss of services.  Hopkins v. Blanco, 302 A.2d 855 (Pa. Super. Ct. 1973), aff'd, 320 A.2d 139 (Pa. 1974).

In <u>McPeek v. Lockhart</u>, 2005 Tenn. App. LEXIS 199, at *8
(Tenn. Ct. App. March 24, 2005), the court noted that although a
claim for loss of services is a derivative claim, it is separate
from the injured spouse's claim.[8]  The court explained that

> a jury verdict finding for the injured spouse
> but also denying a [loss of services] claim
> is not necessarily inconsistent because [loss
> of services] is "a distinct and separate
> cause of action from that of the injured
> spouse's claim."  As [loss of services] is
> its own separate cause of action, it does not
> necessarily follow that simply because the
> injured spouse is found to have a legitimate
> claim that there then must be [loss of
> services] for the non-injured spouse.

<u>Id.</u> at *9.

There, Mr. and Mrs. McPeek sued the defendant following an
automobile accident in which Mrs. McPeek was injured.  Following
a jury trial, Mrs. McPeek was found to be 40% at fault.  The jury
awarded Mrs. McPeek $4,000 and awarded her husband $0 on his
claim for loss of services.  The plaintiffs challenged that
result, arguing on appeal that the verdict was inadequate because
the jury failed to award loss of services to the husband.  The
court disagreed with the plaintiffs that the award of zero
damages was unreasonable, summarizing the pertinent evidence as
follows:

---

[8] According to the court in <u>McPeek</u>, under Tennessee law a
claim for loss of services is part of a claim for loss of
consortium.  For ease of exposition, this Court will substitute
"loss of services" for "loss of consortium" in its discussion of
the <u>McPeek</u> decision.

> Plaintiffs testified that prior to the
> accident, Ms. McPeek did things for her
> husband including cooking meals and helping
> him get out of the bathtub.  Although both
> plaintiffs claimed that things were not like
> they were prior to the accident, Mr. McPeek
> admitted that his wife still is able to cook
> meals and Ms. McPeek testified that she now
> cooks meals that are quick and easy rather
> than big meals.  In addition, Ms. McPeek
> testified that instead of helping her husband
> to get out of the bathtub and to the bedroom
> to put on his prosthetic leg as she used to,
> she now brings the prosthetic leg to the
> bathroom for him.

Id. at *10.  Moreover, Mr. McPeek testified that prior to his

wife's accident "[s]he did everything for me."  Id. at *2.

The court held that despite the wife's diminished physical

capacity and ability to provide certain services to her husband –

most notably, helping him walk – the zero dollar award was

reasonable.[9]

In Rangolan v. County of Nassau, 51 F.Supp.2d 236 (E.D.N.Y.

1999), aff'd in part, rev'd in part on other grounds, 370 F.3d

239 (2d Cir. 2004), the court held that damages for loss of

services does not automatically follow to one spouse from a

finding of liability on the other spouse's tort claims.  In that

case, the district court granted the defendant's motion for a new

---

[9] In McPeek the plaintiffs offered more extensive testimony
on the loss of services claim than Plaintiffs have here.  Indeed,
in McPeek both the husband and wife offered testimony on the loss
of services claim.  In this case, that Mr. Miletta did not
testify on this issue at trial only further supports the
conclusion that the jury's award should not be disturbed.

trial, thereby overturning a jury's verdict in favor of a husband and wife.  The jury had awarded the husband $1,250,000 for injuries suffered when he was assaulted while in custody at the Nassau County Correctional Center.  The wife was awarded $60,000 for her loss of services claim.

There, the husband was incarcerated at the time he was assaulted by a fellow inmate.  As a result of the assault, the plaintiff lapsed into a coma for three days.  The plaintiff's expert testified at trial that the plaintiff suffered a right sided depressed skull fracture with a small subarachnoid hemorrhage.  Additionally, the expert testified that the plaintiff sustained a cerebral concussion with post concussion syndrome and headaches, a fractured skull, a circular scar on the side of the head, and organic brain damage diagnosed as post-traumatic seizure disorder.[10]

On the issue of loss of services (which included loss of companionship and society) the plaintiff's wife testified that they lived together for one year prior to his incarceration. Following the accident, the husband was transferred to another correctional facility where he remained at the time of the trial. In addition, the court noted that there was no evidence offered concerning the services that the husband performed for the wife.

---

[10] The defense expert's prognosis was less severe.

18

During the husband's incarceration, his wife visited him six
times.

In granting the defendant a new trial, the court in <u>Rangolan</u>
relied primarily on the fact that the husband was incarcerated
from the time of the accident forward.  The court explained that
"it is difficult for the Court to imagine, and the evidence has
not revealed, how [the wife] has suffered loss of services while
her husband has been in custody . . . ."  <u>Id.</u> at 243-44.
Furthermore, the court concluded that even if the two plaintiffs
ultimately reunite following his release, "it is difficult to
visualize what loss of services will result from [the husband's]
residual damages, namely depression, headaches, and possible
seizures."  <u>Id.</u> at 244.[11]

This Court believes that the reasoning explicated in the
above decisions is sound and should be applied to the facts of
this case.  Accordingly, the Court holds that, under New Jersey
law, Mrs. Miletta is not per se entitled to recovery for loss of
services and companionship solely based on recovery by her
husband for his negligence claims.  Indeed, the Court instructed
the Jury following the presentation of evidence that Mrs. Miletta
is only "entitled to fair and reasonable compensation for any

---

[11] As noted in the discussion below, however, the court did
acknowledge that companionship and society "can be reasonably
inferred from the state of marriage itself."  <u>Rangolan</u>, 51
F.Supp.2d at 244.

loss or impairment of her spouse's services because of his injuries, which has been sustained by her as a proximate result of the defendants' negligence." [Docket Item 111.]  Nothing relieved Plaintiffs from their burden of proof as to such damages for loss of services and companionship.

Moreover, based on the evidence it would have been reasonable for the Jury to conclude that Mr. Miletta did not provide the services about which Mrs. Miletta testified.  At trial, Mrs. Miletta testified that the Miletta's son, Joey, was born on June 2, 2000 and that "Steve helped with the baby in every way."  (3/21/05 Trial Testimony.)  According to Kelly Miletta, this included changing diapers as well as feeding and bathing the baby.  (Id.)  Additionally, Mrs. Miletta testified that before Mr. Miletta's accident, Mr. Miletta would take sole care of the baby every Tuesday night, which included midnight feedings.  Mrs. Miletta testified that while Mr. Miletta was in intensive care, and for several months after his return home from the hospital, he was unable to assist with the care of the baby.

Notably, however, Mr. Miletta did not testify that he helped feed and bathe their son prior to his accident, or that he was unable to do so afterwards.  To be sure, Defendants did not cross-examine Mrs. Miletta nor did they offer direct evidence contradicting her testimony.  However, the Jury was free to give

20

little or no weight to Mrs. Miletta's testimony.[12] Accordingly, the jury's determination that Mrs. Miletta suffered no loss of services is reasonable.[13]

Similarly, the jury's zero award for Mrs. Miletta's loss of companionship claim does not shock the judicial conscience.  To be sure, in Rangolan, supra, the court held that some loss of companionship "can be reasonably inferred from the state of marriage itself."  51 F.Supp.2d at 244.  In that case, the jury had awarded the wife of the assault victim $60,000 on her loss of services claim.  The defendant subsequently moved for a new trial, arguing that the jury award was unreasonably high, and the court ordered a remittitur in the amount of $20,000.  The court there, however, determined the remittitur amount based on the maximum amount a reasonable jury could have awarded, where the

_____

[12] By this conclusion the Court does not suggest that the testimony given by Mrs. Miletta was not truthful.  Indeed, at oral argument counsel for Defendants were unable to point to any specific testimony which should have been construed by the Jury to be false.  Rather, the Court is merely pointing out that a jury is free to make its own credibility determinations and give testimony the weight it believes is appropriate.  That the Jury was unimpressed by Mrs. Miletta's claimed losses of her husband's assistance in caring for their infant is within the province of the jury.

[13] Mrs. Miletta also testified that Mr. Miletta had begun construction on an addition to their home but that after his accident he was unable to work on the project.  Because no evidence was offered that Mrs. Miletta paid someone else to finish the project while Mr. Miletta was recovering and because the project only remained in an unfinished state for a relatively short while, it was reasonable for the Jury to have awarded Mrs. Miletta nothing for her loss of services related thereto.

original award was excessive.  It does not logically follow from
that conclusion that a zero dollar award in a different case,
under different facts, would be unreasonable.  Similarly here,
that a positive award would have been reasonable does not require
a holding that a $0 recovery is per se inadequate.  In short, the
evidence in this case, when weighed by the Jury, could reasonably
support its conclusion, or a contrary conclusion awarding at
least modest damages.

For the above reasons, the $0 award for Mrs. Miletta's loss
of services and companionship claim will stand.

B.   Motion for Reconsideration By Ranco

Once again this Court is being asked to interpret the
indemnification clause contained in the subcontractor agreement
between Syska Hennessy and Ranco, and to apply the jury's
findings regarding the respective liability of Ranco (15%) and
Syska Hennessy (30%).[14]  A party seeking reconsideration of a

---

[14] This matter originally came before the Court upon the
motion of Syska Hennessy for partial summary judgment seeking a
declaration that it is entitled, under its subcontractor
agreement with Ranco, to full indemnification and reimbursement
from Ranco so long as Syska Hennessy is not wholly liable for
Plaintiffs' injuries. [Docket Item 46].  The Court denied that
motion [Docket Items 63, 64] and Ranco filed a motion for
reconsideration [Docket Item 66] which the Court denied. [Docket
Item 72].  Ranco has now filed a second motion for
reconsideration [Docket Item 120] and Syska Hennessy has filed a
cross-motion for summary judgment seeking an order compelling
Defendant Ranco to pay "70% of [Syska Hennessy's] total
reasonable defense costs and attorney's fees in connection with
the defense of above-entitled litigation." [Docket Item 124.]

decision "must show more than a disagreement with the court's decision." Panna v. Firstrust Sav. Bank, 760 F. Supp. 432, 435 (D.N.J. 1991); see L.Civ.R. 7(I).  Instead, the party seeking reconsideration must show either that (1) there was an intervening change in the controlling law; (2) new evidence became available that was not available when the court issued its decision; or (3) reconsideration is needed to correct a clear error of law or fact or to prevent manifest injustice.  Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).[15] By its present motion, Ranco is able to satisfy this last requirement and, thus, its motion for reconsideration will be granted.

The indemnification clause in the contract between Syska Hennessy and Ranco provides:

> 4.6.1.    To the fullest extent permitted by law, the Subcontractor [Ranco Construction] shall indemnify and hold harmless the Owner, Contractor [Syska Hennessy], Contractor's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the

---

[15] Syska Hennessy erroneously argues in opposition that the motion by Ranco is untimely under Rule 59(e), Fed.R.Civ.P., and that the requirements of Rule 60(b), Fed.R.Civ.P., have not been met.  The instant motion, however, is governed by L.Civ.R. 7(I), the requirements of which have been satisfied, as explained below.

extent caused by the negligent acts or omissions of the Subcontractor [Ranco Construction], the Subcontractor's Sub-subcontractors [Joseph Trongone, Jr., Inc. and Miletta Brothers], anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder [Syska Hennessy].  Such obligation shall not be construed to negate, abridge, or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 4.6.

By Opinion and Order dated October 6, 2003, this Court denied in part the motion for partial summary judgment by Syska Hennessy, holding in the first instance:

The indemnification clause, when read in its totality, clearly provides that Ranco Construction is only required to indemnify to the extent of its, or its subcontractor's, fault.  It is required to do so if Syska Hennessy is not at fault; it is required to do so even if Syska Hennessy is partially at fault.  Its obligation remains the same; it must indemnify, but only to the extent that the damages were incurred by its, or its subcontractor's, negligence.  With this reading, the "regardless" clause is not surplusage, but instead ensures contractually that the common law rule of indemnification is not followed, namely that "a party seeking common law indemnification from another must be without fault."  See Huck v. Gabriel Realty, 136 N.J. Super. 468, 474 (Law Div. 1975) (citing Public Service Electric & Gas Co. v. Waldroup, 38 N.J. 419, 432 (1956) for common law rule).  Thus, here, the "regardless" clause makes clear that Syska Hennessy may seek indemnification even if it is not without fault, but does not change its clear proviso that Syska Hennessy may only seek indemnification to the extent that the damages are caused by Ranco Construction or its subcontractors.

24

(10/6/03 Slip. Op. at 9-10.)  As to the issue of defense costs,
however, the Court agreed with Syska Hennessy that "the clause
requires Ranco Construction to indemnify it for its fees in an
amount equal to the percentage of fault of Ranco Construction and
its subcontractors."  (Id. at 10.)  The Court reasoned that

> [i]n this case, where joint liability is
> likely so that there will likely be no one
> but-for cause of the accident, the accident
> likely would not have occurred, and Syska
> Hennessy would not have incurred any defense
> costs, if others, including Ranco
> Construction and its subcontractors, were not
> involved.  In other words, because if it is
> found that Syska Hennessy did not cause this
> accident on its own, it would follow that
> Syska Hennessy would not have had to defend a
> lawsuit at all if it were the only contractor
> involved.  Thus, in the event that joint
> liability is proven involving Ranco
> Construction and its subcontractors, Syska
> Hennessy will have incurred fees that it
> would not have incurred but for the
> negligence of the other joint tortfeasors,
> which would include Ranco Construction and
> its subcontractors.  Under the terms of the
> indemnification clause, Syska Hennessy is
> entitled to indemnification for such amounts
> incurred because of the fault of Ranco
> Construction and its subcontractors.

(Id. at 11.)  Ranco subsequently asked the Court to reexamine its
holding, which the Court did.  By Memorandum Order dated February
13, 2004, the Court again explained that "Syska Hennessy [would]
bear the percentage of its attorneys fees that is equal to its
percentage of fault for the accident." [Docket Item 72.]

Following the jury trial, and pursuant to the Court's April
11, 2005 Scheduling Order, Ranco again moves for reconsideration.

Ranco maintains that absent any imputed liability to Syska
Hennessy due to the negligence of Ranco or its subcontractors,
Ranco is not required to indemnify Syska Hennessy for any of its
attorney's fees or costs.  (Ranco Br. at 3.)  In light of the
theory of negligence of these Defendants presented to the Jury
(which did not seek to make Syska Hennessy liable on a theory of
respondeat superior for the negligence of Ranco or others), and
the jury's findings as to the apportionment of negligence among
the parties, this Court agrees.

The indemnification agreement between Syska Hennessy and
Ranco provides that Ranco will indemnify Syska Hennessy for all
expenses, including but not limited to attorney's fees, to the
extent caused by Ranco, Trongone or Miletta, "regardless of
whether or not such expense is caused <u>in part</u> by" Syska Hennessy.
(emphasis added).  The Jury in this case, however, returned a
verdict that Syska Hennessy was itself 30% liable for Mr.
Miletta's injuries.  In other words, the Jury found that none of
Syska Hennessy's 30% liability was "arising out of or resulting
from" the subcontractors' work but, rather, arose only from Syska
Hennessy.  Accordingly, the legal costs incurred by Syska
Hennessy were caused <u>entirely</u> (not "in part") by its independent
negligence and not that of any of the other defendants.[16]  Syska

---

[16] To be sure, Syska Hennessy argues that it's negligence was
"passive" and that the jury's apportionment of liability to Syska
Hennessy was "based on the asserted non-delegability of site
safety responsibility as general contractor."  (SH Opp. Br. at
8.)  While the contractor has overall responsibility for site

Hennessy had to defend itself entirely because of its own negligence, and not due to the negligence of Ranco, even in part. Therefore, Ranco is not obligated to indemnify Syska Hennessy for those costs.

In case any doubt remains, the New Jersey Supreme Court has made clear that "[t]he right to legal costs follows the right to indemnification." Mantilla v. NC Mall Assocs., 770 A.2d 1144, 1151 (N.J. 2001). Mantilla involved a personal injury claim arising from a slip and fall at Newport Mall in Jersey City, New Jersey ("Mall"). The plaintiff sued the Mall as well as the company hired by the Mall to perform cleaning services ("PBS"). At the conclusion of the trial, the jury awarded the plaintiff $197,000 in damages and apportioned the negligence in the following way: 40% to the Mall; 50% to PBS; and 10% to the plaintiff. Following entry of judgment, the Mall moved pursuant to an indemnity agreement with PBS to compel PBS to pay for its litigation expenses and to provide indemnification for its part of the judgment.

---

safety under New Jersey law, and the Jury was so instructed, the Court did not instruct the Jury on respondeat superior liability nor did any party argue that theory of liability to the Jury. The Jury found each defendant's separate liability, as well as the comparative negligence of Mr. Miletta. At no time was the Jury instructed that another party's negligence could be attributed to Syska Hennessy. Thus, the Court is confident that the 30% liability ascribed to Syska Hennessy is solely due to Syska Hennessy's own acts and omissions, and not Ranco's, even in part.

The court in <u>Mantilla</u> held "that absent explicit contractual language to the contrary, an indemnitee who has been found to be at least partially at fault may not recover the costs of its defense from an indemnitor."  770 A.2d at 1145.  Moreover, because the court there determined that the relevant agreement between the Mall and the defendant cleaning service did not include such language, the agreement did not "override contractually" the "default rule" that "an indemnitee who has defended against allegations of its independent fault may not recover its [defense] costs."  <u>Id.</u> at 1150 (alteration in original) (citations omitted).  The court in <u>Mantilla</u> further held that because there was

> clearly evidence of the Mall's independent negligence . . ., we hold that Newport Mall's defense costs were losses resulting from its own negligence and not that of PBS.  The right to legal costs follows the right to indemnification.  Because the PBS-Newport contract failed to express in unequivocal terms that PBS would indemnify Newport Mall for legal expenses incurred in defending itself against claims of it own negligence, we conclude that PBS cannot be held responsible for those costs.  That result follows because the PBS-Newport Mall contract does not expressly state that PBS will indemnify Newport Mall for the costs of defending against claims of Newport Mall's negligence.

<u>Id.</u> at 1151.  Several years later, the New Jersey Supreme Court reaffirmed <u>Mantilla</u>, holding that "in order to allay even the slightest doubt on the issue of what is required to bring a negligent indemnitee within an indemnification agreement, we

reiterate that the agreement must specifically reference the negligence or fault of the indemnitee." Azurak v. Corporate Property Investors, 814 A.2d 600, 601 (N.J. 2003).

As in Mantilla, the agreement between Syska Hennessy and Ranco does not explicitly provide that Ranco will indemnify Syska Hennessy for the costs of defending its independent negligence. This Court previously recognized as much when it held that Ranco "is only required under the agreement to indemnify to the extent of its, or its subcontractor's, fault." (Slip op. at 9.) The Court's holding on that question is dispositive as to the issue of indemnification for legal costs as well. As Mantilla made clear, in cases such as this, where the indemnitee is not entitled to indemnification for damages caused by its own negligence, certainly it can not recover defense costs resulting therefrom.

For the above reasons, the motion by Defendant Ranco for reconsideration will be granted, and judgment upon Syska Hennessy's cross-claim for indemnification will be entered in favor of Ranco, and the cross-motion by Syska Hennessy will be denied.[17]

---

[17] Counsel for Defendant Ranco, John Gercke, agreed at oral argument on May 5, 2005 to abandon its cross-claim for contractual indemnification against Defendant Trongone in the event that Ranco's motion for reconsideration was successful. Regardless, as the relevant language contained in the indemnification agreement between Ranco and Trongone is substantially similar to that contained in the agreement between

C.   <u>Application by Ranco For Entry of Judgment</u>

Ranco has additionally moved, through its counsel James Landgraf, Esq., for entry of judgment in its favor and against Syska Hennessy and its payment bond surety, third-party defendant St. Paul Mercury Insurance Co. ("St. Paul"), jointly and severally, pursuant to 40 U.S.C. § 3133.[18]  The amount of the judgment sought is $73,139.00, together with interest calculated pursuant to 31 U.S.C. § 3901 <u>et</u> <u>seq.</u>

Syska Hennessy has stipulated that the unpaid balance being withheld on its subcontract with Ranco is $77,139.00.  (Joint Pre-Trial Order, Part II ¶ 17.)  Syska Hennessy has withheld payment of that sum, however, arguing for the first time, post-trial, that Ranco, its insurance carrier (Ohio Casualty), and Ranco's attorney, Mr. Gercke, intentionally and wrongfully withheld that Syska Hennessy had been certified as an additional insured under the Ranco policy issued by Ohio Casualty.  Ohio Casualty is not represented in this case, nor has Syska Hennessy filed such a claim against Ohio Casualty.  Such a suit remains a future possibility.  Because Syska Hennessy's payment obligations

---

Syska Hennessy and Ranco, the analysis above applies with full force to Ranco's cross-claim for contractual indemnification. For these reasons, summary judgment will also be entered in favor of Trongone on Ranco's cross-claim for contractual indemnification.

[18] St. Paul is not a party to the underlying personal injury action.  It is named in Ranco's third-party complaint only as the surety of Syska Hennessy upon the payment bond.

to Ranco are separate and distinct from any obligation Ranco may
have had to inform Syska Hennessy of its status as an additional
insured, the Court will grant Ranco's motion and enter judgment
against Syska Hennessy and St. Paul and in favor of Ranco for the
following reasons.[19]

Pursuant to 40 U.S.C. § 3133:

> Every person that has furnished labor or
> material in carrying out work provided for in
> a contract for which a payment bond is
> furnished under section 3131 of this title
> and which has not been payed in full within
> 90 days after the day on which the person did
> or performed the last of the labor or
> furnished or supplied the material for which
> the claim is made may bring a civil action on
> the payment bond for the amount unpaid at the
> time the civil action is brought and may
> prosecute the action to final execution and
> judgment for the amount due.[20]

"The Miller Act requires a general contractor on a federal
project to post a surety bond to protect those who supply labor
and materials for the project, and enables suppliers to bring
suit on the bond for any unpaid amounts, whether owed by the
general contractor or one of its subcontractors."  United States
ex rel. Casa Redmix Concrete Corp. v. Luvin Construction Corp.,
2001 U.S. Dist. LEXIS 6184, at *4 (S.D.N.Y. May 11, 2001)

---

[19] The Court has jurisdiction over this claim pursuant to
28 U.S.C. § 1331 and 40 U.S.C. § 3133(b).

[20] The Miller Act, 40 U.S.C. § 3131 et seq., was codified at
40 U.S.C. § 270a et seq. prior to the 2002 revision.

(granting plaintiff's motion for summary judgment on Miller Act claim).

Four elements must be proven to collect under this section: (1) that labor and materials were furnished pursuant to the particular contract at issue; (2) that the supplier of the labor and materials is unpaid; (3) that the supplier had a good faith belief that the labor and materials were intended for the specified work; and (4) the plaintiff gave written notice to defendants within 90 days of the date of the last labor furnished or materials supplied.   Id.

Here, there is no dispute that all four elements have been satisfied.  First, Syska Hennessy concedes that Ranco furnished labor and materials specified under the subcontractor agreement; second, there remains an unpaid balance of $73,139.00 for the labor performed and materials supplied; finally, Ranco provided notice and demand for payment upon Syska Hennessy by letter dated January 23, 2003, less than 90 days after it submitted its final invoice.  Accordingly, judgment will be entered in favor of Ranco in the amount of $77,139.00.

Additionally, Ranco seeks interest on the unpaid balance. The Prompt Payment Act, 31 U.S.C. § 3905, provides: "Each construction contract awarded by an agency shall include a clause that requires the prime contractor to include in each subcontract for property or services entered into by the prime contractor and a subcontractor (including a material supplier) for the purpose

of performing such construction contract" both a "payment clause" and an "interest penalty clause."  The former requires the prime contractor to pay the subcontractor for "satisfactory performance" within seven days.  The latter obligates the prime contractor to pay the subcontractor an "interest penalty" on amounts due in the case of each payment not properly made.

The relevant language of the subcontractor agreement between Syska Hennessy and Ranco states:

> The Subcontractor shall be entitled to be paid an interest penalty of any late payment computed at the rate of interest established by the Secretary of Treasury and published in the Federal Register, for interest payments under Section 12 of the Contract Disputes Act of 1978 in effect at the time the Contractor accrues the obligation to pay an interest penalty as specified in the Prompt Payment Act.

(Agreement ¶ 4.7.1, Ranco Ex. D.)

Under the Prompt Payment Act, "the interest penalty shall be paid for the period beginning on the day after the required payment date and ending on the date on which payment is made." 31 U.S.C. § 3902(b).  The interest shall be computed at the rate of interest established by 41 U.S.C. § 611.  The rate to be applied to interest paid pursuant to that provision is the variable rate established at 6 month intervals rather than the fixed rate in effect at the time the interest begins to run.

Here, Ranco is seeking interest on the unpaid balance commencing February 8, 2003 through the present.[21] (Ranco Br. at 4.)  The following interest rates apply to the relevant periods:

| | | |
|---|---|---|
| 1/1/2003 – 6/30/2003 | | 4.250% |
| 7/1/2003 – 12/31/2003 | | 3.125% |
| 1/1/2004 – 6/30/2004 | | 4.000% |
| 7/1/2004 – 12/31/2004 | | 4.500% |
| 1/1/2005 – 6/30/2005 | | 4.250% |

(Ranco Ex. E.)  Because simple, not compound, interest is awarded under 41 U.S.C. § 611, a per diem calculation may be utilized:

| | |
|---|---|
| 2/8/2003 – 6/30/2003 | $8.52 per diem (142 days) |
| 7/1/2003 – 12/31/2003 | $6.26 per diem (184 days) |
| 1/1/2004 – 6/30/2004 | $8.01 per diem (181 days) |
| 7/1/2004 – 12/31/2004 | $9.02 per diem (184 days) |
| 1/1/2005 – 5/26/2005 | $8.52 per diem (146 days) |

Based on these figures, Ranco is entitled to interest on the unpaid balance of $73,139.00 in the amount of $6,715.09 through May 26, 2005.  A $79,854.09 judgment will be entered in favor of Ranco and against Syska Hennessy and St. Paul, jointly and severally.[22]

---

[21] This date represents ninety days from Ranco's presentation of its November 8, 2002 application to Syska Hennessy.

[22] The Court declines Syska Hennessy's counsel's request to delay entry of judgment upon this undisputed Miller Act claim for Ranco's work completed and not paid for, pending some future assertion and resolution of Syska Hennessy's potential claim that

> D.   This Court Will Decline to Exercise Supplemental
>      Jurisdiction Over the Remaining Non-Diverse State Law
>      Claim by Ranco Against Trongone for Breach of Contract

The remaining claim before the Court is a cross-claim by
Ranco against Trongone for breach of contract, namely, Ranco's
claim that Trongone had promised to add Ranco as an "other
insured" under Trongone's insurance policy but failed to do so.
The Court will decline to exercise supplemental jurisdiction over
this claim pursuant to 28 U.S.C. § 1367(c) and it will be
dismissed without prejudice.

Section 1367(a) provides that "in any civil action of which
the district courts have original jurisdiction, the district
courts shall have supplemental jurisdiction over all other claims
that are so related to claims in the action within such original
jurisdiction that they form part of the same case or controversy
under Article III of the United States Constitution."  28 U.S.C.
§ 1367(a).  Subsection (c) of § 1367 enumerates the four
categories of claims over which a district court has supplemental
jurisdiction but which the court may decline to adjudicate:

---

Ranco and Ohio Casualty failed to advise it of its alleged other-
insured status under Ohio Casualty's policy.  The Court declines
to exercise its discretion in favor of such a stay in light of
the Miller Act's policy for prompt payment of subcontractors on
federally funded construction projects, see 31 U.S.C. § 3902,
supra, as well as the uncertain viability of this potential,
unasserted claim.  That Syska Hennessy recently discovered an
alleged notice of such other-insured status in its own files does
not strengthen its hand, but this Court – and indeed the parties
themselves – lack sufficient information, let alone evidence,
upon this subject, and no determination can be made.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). "Section 1367(c) . . . was intended simply to codify the preexisting pendent jurisdiction law, enunciated in Gibbs and its progeny, concerning those instances in which a district court is authorized to hear a state claim it would have the power to hear because of its relationship to an original federal jurisdiction claim." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995); see United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966). "The statute . . . reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 173 (1997) (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)).

Of particular importance here is the second category of claims described in section 1367(c)(2) – those which

36

"substantially predominate" over the federal claims.  As the

Third Circuit has instructed, the language of that provision is

adapted directly from Gibbs and, thus, it "should be understood

in that context."  West Mifflin, 45 F.3d at 788.  The Court held

in Gibbs that "if it appears that the state issues substantially

predominate, whether in terms of proof, of the scope of the

issues raised, or of the comprehensiveness of the remedy sought,

the state claims may be dismissed without prejudice and left for

resolution to state tribunals."  383 U.S. at 726-27.  The Third

Circuit has cautioned, however, that

> [i]t is important to recognize that this
> standard [under 1367(c)(2)] was fashioned as
> a limited exception to the operation of the
> doctrine of pendent jurisdiction – a doctrine
> that seeks to promote judicial economy,
> convenience, and fairness to litigants by
> litigating in one case all claims that arise
> out of the same nucleus of operative fact.
> When a district court exercises its
> discretion not to hear state claims under §
> 1367(c)(2), the advantages of a single suit
> are lost.  For that reason, § 1367(c)(2)'s
> authority should be invoked only where there
> is an important countervailing interest to be
> served by relegating state claims to state
> court.

West Mifflin, 45 F.3d at 789.

In the present case, whether Trongone was to provide

insurance coverage to Ranco, and the consequences, if any, of

Trongone's failure to do so, do not arise from the same facts and

circumstances as the original federal claim of Plaintiffs against

the United States.  When the Court dismissed the Federal Tort

37

Claims Act case against the United States, it retained
supplemental jurisdiction over Plaintiffs' personal injury claims
against the defendant contractors, and the contractors' cross-
claims among themselves relating to the liability for Plaintiffs'
claims, as these were so related to the original federal
jurisdiction claim under the FTCA that "they form[ed] part of the
same case or controversy under Article III," within the meaning
of 28 U.S.C. § 1367(a), supra.  See Bank of India v. Trendi
Sportswear, 239 F.3d 428, 436-37 (2d Cir. 2000) ("It is well-
settled that a third-party action for indemnification comes
within a court's ancillary jurisdiction.").  Those claims and
indemnification-related cross-claims were tried to a verdict and
also adjudicated herein.

     This remaining claim by Ranco against Trongone for insurance
coverage, however, depends upon entirely different facts
surrounding the alleged making of a contract between those
parties and the understandings of those parties regarding that
obligation.  This dispute does not fall within the exceptional
circumstances for exercising supplemental jurisdiction outlined
in § 1367(c), supra, and the Court declines to retain such
jurisdiction over this remaining claim.

     Even if the Court could retain jurisdiction over this cross-
claim, because judicial economy, convenience and fairness to the
litigants would not be served by doing so, the Court would

dismiss the claim under § 1367(c)(2).[23]  In the first instance, the parties have not undertaken substantial discovery on this claim.  Likewise, this Court has expended little if any judicial resources relating to the cross-claim.  In other words, the burden of this non-diverse state claim would be the same for a state tribunal as it would for this Court – there would be no significant duplication of effort if this claim were pursued elsewhere.  Finally, resolution of this cross-claim would delay entry of final judgment on the underlying personal injury action.

For these reasons, the remaining cross-claim by Ranco for breach of contract will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(2).

## III. CONCLUSION

For the reasons expressed in this Opinion, the Court will deny Plaintiffs' motion for a new trial [Docket Item 122]; grant Ranco's motion for reconsideration; grant the motion by Trongone for summary judgment on Ranco's cross-claim for contractual indemnification [Docket Item 118]; deny the motion by Syska Hennessy seeking payment by Ranco of 70% of its reasonable attorney's fees and costs [Docket Item 124] and enter judgment upon Syska Hennessy's cross-claim for indemnification [Docket

_____

[23] Indeed, Ranco itself maintains that its own cross-claim "should be dismissed without prejudice on jurisdictional grounds." (Ranco Opp. at 3.)  Nor was Trongone advocating this Court's retention of supplemental jurisdiction in this aspect of the case.

Item 15] in favor of Ranco; dismiss without prejudice the cross-
claim by Ranco against Trongone for breach of contract [Docket
Item 23]; and grant Ranco's application for judgment [Docket Item
119] in the amount of $79,854.09 against Syska Hennessy and its
payment bond surety, third-party defendant St. Paul Mercury
Insurance Co.

The accompanying Order is entered.


**May 27, 2005**                          **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge